Court, please call the next case. On 14-1306, ABF Freight System v. Johnson & Newton. Counsel. May it please the Court. Good morning, Honors. Good morning, Counsel. My name is Matthew Gnafo. I represent the employer in this matter, ABF Freight. We have a petitioner here, Mr. Rodriguez. He was driving a forklift from his semi-trailer back onto the dock. The forklift struck the dock plate. Mr. Rodriguez was jarred and he started feeling ridiculous pain. Mr. Rodriguez is quite a large individual. The records indicate his weight is between 365 up to 388 pounds. It's identified as a super morbid obese. He starts treatment. He presents for treatment and the doctor indicates a long-standing history of back problems. Now, at trial, he testified that he had gone to the doctor once before the same month, August 2011, but that was it. So that's obviously in conflict with the doctor's history of this long-standing issue. Regardless, the case is initially accepted. TTD is paid. A surgery is performed on him. He has a 2011 disectomy and this is performed October 6, 2011. Things are going extremely well at first. As recently as October 21, 2011, Dr. Stanley, this is the treating surgeon, the leg pain is completely gone. The knee pain is much better. Petitioner is doing well and off of all narcotic medication at this time. This is just about two and a half weeks after the surgery. Now, something happens between this date and the next visit a month later on November 21, 2011. There's, quote, acute recurrence of his left leg radicular symptoms, end quote. And this is Dr. Stanley's record and we did take his deposition. There was testimony regarding what happened here and this acute occurrence. It was never alleged that this acute occurrence occurred while petitioner was working. Dr. Stanley testified, actually, just to back up a second, he went to say to the extent that petitioner was doing perfect following the surgery. And then this recurrence of the radicular symptoms occurred and Dr. Stanley testified they're not unusual. They can occur spontaneously with activities of daily living. When I asked Dr. Stanley whether it was his opinion he recurrent did not identify a disc or radicular symptoms or whatever you wanted to identify at that time occurred as a result of activities of daily living, he responded yes. So now we've got an MRI a month later in December of 2011. The radiologist does not identify a disc herniation in these films during this diagnostic. The treating doctor does. We schedule an IME. IME Dr. Zellwey does not identify a herniation at this time either. Dr. Zellwey indicates another surgery is not appropriate, obviously, if there's not a disc to be plucked out. This is what Dr. Stanley wanted to do and he recommended further work conditioning for the petitioner. Now, a couple months later, March of 2012, we've got another event. So he's in the garage, he's on a chair reaching something. We have a battle here, don't we, between two doctors? That's correct, Your Honor. And why is Zellwey the one that should be credited? It's not only Dr. Zellwey who didn't find the disc herniation on the December of 2011 MRI. It's the radiologist as well. So you're right, it's sort of a battle between the two doctors, except the respondent has the additional evidence that the radiologist who's just looking at the films, he doesn't see that disc herniation either. So it's a little bit more than just treating Dr. Rush's IME. But have you heard of the phrase that in reviewing the manifest weight of the evidence standard, it's not measured simply by counting noses? I haven't heard that phrase, Your Honor, but I do understand what it means, but I don't think it would necessarily carry the day, would it? True, I just wanted to address Justice Holder's question. I understand, it's a point you should be making, but his question is, again, as the theme has been all week, who judges the credibility of the doctors and who assesses the weight to be given to the evidence? The commission, Your Honor, I fully understand that. And then just to briefly comment on a couple of the other issues, the average weekly wage, there's obviously a dispute there. Well, you can go and attack Stanley. I'm sorry? You can attack Stanley and say, you know, I mean, you don't say that Stanley doesn't have a basis for a credible opinion. That's certainly my position in the brief, Your Honor. I know you didn't want to rehash all the facts of the brief, so I wasn't sure the extent. I just wanted to focus on the, we know the timeline of what happened and the laceration and all of that. So what was the alleged error with the weekly wage you were about to say? They don't take into account the significant portion of time where he's working a different job in the 52-week period prior to the date of loss, Your Honor. The commission doesn't take that into account in the calculation. They merely go on the most recent job that he had. He was working for this same employer, making a different wage. Then he got essentially promoted, started making more money. However, it's not the totality of the time and the wages that he earned throughout the entire period that he was working there prior to the date of loss that the commission used in their calculation. I just heard you say it was a different job. Was it a different job? He got a different job with the same employer? It was a different job responsibility, certainly, and increased benefits when he got that promotion and an increased wage. So I can't testify to the specific differences between what he was doing and when he became the meeting position, but there's no question in my mind that it was a different position, Your Honor. Was one full time than the other person? Was he doing the same thing? I don't believe so. I don't think he was driving to the extent that he was, and he was driving when the injury occurred. It's when he's transferring, sorry, when he's moving the forklift between the trail and back onto the dock. Was one job full time and the other job part time? I don't believe so, Your Honor. 19 hours a week full time in your mind? I think that, I'm sorry. Was 19 hours a week full time in your mind? I think that was an outlier week for the time that he was working the pre-union job, Your Honor. So you're not disputing the full time, part time issue? No. What are you disputing then? The way they calculated it. They didn't take the wages that he worked the whole time into account. They basically cut off the time that he wasn't working the union job. They didn't take that into account at all. They only took the 13 week estimated period that he had the promoted job, the increased wages, and they based the calculation on that. Not the totality of the wages that he earned in the 52 week period prior to the injury. So you're relying on the definition of average weekly wage in the statute when it states that it's to be calculated based on the actual earnings of the employee in the employment in which he was working at the time of the injury. And you would say that that would encompass the other position that the commission did not include. Precisely. And it's the words in the employment in which he was working. So what's your interpretation of that statute? In the employment. In the employment for this respondent, for this employer. The work that he was doing throughout the year prior to the date of loss. Does it have to be the same work? That's why I'm here. That's why we're asking for a decision from your honors regarding these issues, your honor. That's exactly right. So you have no case that's specifically on point that covers this factual situation that you're aware of? No case from your honors. That's correct. There's no appellate court case that I was able to cite on this issue. Maybe this will be the case. When he was working the 19 hours, was that spread over a full work week? How many days a week did he work to accumulate 19 hours? I think it was just a few days that he worked. Eight hour days and then maybe a five hour day the last day, your honor.  For that week that he worked 19 hours. And it was only one week, you say? Your honor, if you've got evidence in front of you to contradict me, I can't dispute it. I'm trying to figure this out because if he loses five or more calendar days during the 52 week period, then you don't count those weeks in computing. So we've got to know when he worked 19 hours, how many weeks did he work 19 hours? Or is this only one week he worked 19 hours? I believe it's only one week. If you're looking at the record in front of you and the way the statement indicates differently, I obviously am incorrect in that regard. I'd be happy to address that further if you would like, your honors. Any other questions, your honors? I don't believe so. Thank you, counsel. Thank you very much. You may respond. Learned injustices of the public court. You're off to a flying start. That's very good. It's always a privilege to be here and I'm always amazed at it. What about this 19 hours? Was it only one week? You have to understand, the elephant in the room is that he was a casual employee. Yeah, we understand. With no union. They called him in when they wanted him in and when they didn't want him in. The question I have though is, did he miss more than five or more calendar days during the 52 weeks prior to the injury? The answer I believe is yes, your honor. In fact, they called him in as a casual employee whenever they wanted him in. The day in March when he became unionized, he was guaranteed the opportunity to work 40 hours a week. It's a different employment. But it's interesting, the wording of the act does say earnings in the employment in which he was working at the time of the injury. His employment is with the same employer. That's the point, your honor. If your theory were correct, let's assume that a man worked for the City of Chicago Department of Sanitation. And he picked up garbage. And he worked continuously. And then he got promoted and he became a driver. And he was making more money. Your theory would be that you only compute it based on his salary as a driver, not his full 52 weeks. That simply isn't the case. Just because he got promoted, my question is, did he work 52 full weeks for the same employer? If he missed more than five calendar days, whether or not they're the same week, then the earnings for the remainder of the 52 weeks should be divided by the number of weeks and parts thereof that he worked. We just got to figure this out. Your issue though is a conceptual issue. It's a conceptual issue. Let me finish. In which he was working, how do we define that? Right. In which he was working. That calculation flows later. In which he was working. Your view is in which he was working was the position he was at the time of injury and what he was being compensated for for that position. And that's what the legislature intends. So your argument would be in answer to Justice Hoffman's question would be, no, we just look at the driver. We don't look at the garbage thrower. Absolutely correct. And the reason why is very simple. The legislature wanted you to look at the employer. It would have said in the sentence that in the employment of the employer during the previous year, employer is irrelevant to the statute. The day, if any of you were associate judges, the next day you're elected and you become a full circuit judge and you become a justice. Whether your employment is with the same entity of government is irrelevant. What's important to the employer is irrelevant. It's the employment. Now the purpose of the act is to... Every time a guy gets a raise it's new employment? No, of course not. Why not? Because a raise remains within the employment still doing the same activity. If they wanted to say within the occupation, they could say it. If they wanted to say it within the job, they can say it. They said within the employment. And the definition of employment in the standard dictionary is occupation. You want to tell me... I could be wrong, but I believe... If I had a bet, Mr. Rittenberg, you pick that one right out of the air. I believe... I'll get a dictionary and find out if it says occupation. I believe it does. But it says in the employment, earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending on the last day of the employee during his pay period. Prior to his injury. So my question is, you say employment is a synonym for occupation or job? Yes. Okay, we'll see if that is true. Just to ask a practical question, is there an exhibit in the record of any type that shows when he was working as a casual employee? Yes. My question is, what days he worked? Like if he only worked two days in a week, would it show that? Yes. Respondents, I believe Respondents Exhibit 4. Okay. Can you explain to me, what does a spotter do? I know he's a casual employee apparently by that nomenclature, but what does a spotter do versus what did he do at the time of his injury? The spotter is the unionized thing. A spotter is... Since when he became a member of the union and he had to take certain classes, it's in the record, and he was certified as a spotter, then he became a unionized employee and he was able to do, in addition to the doc work, he was authorized to move vehicles around in the yard. Spotter, he was a spotter at the time of the injury, that's correct. Right, he was a unionized position. So after he worked as a casual employee doing whatever, various jobs, he actually took training for the spotter position. Yes, he did. And he was placed in that position. And he got a commensurate... He got a... And his new position was paid at a higher level, a few dollars more an hour. Is there... I'm sorry, is there any more questions on this issue? I believe that there's no reason to reverse the commission's finding on causality. In the fact that they looked at all the evidence, all the testimonies, and they concur, for good reason, that Dr. Stanley was more credible in his reading and testimony than the respondent's expert. Which goes to, and I believe that they haven't shown that the decision of the commission is against the manifest weight of the evidence. And there's clearly... Remember, the herniated disc is at L4, L5. The recurrent disc, which is very definitely in the literature, and the commission sees it sometime between three and four weeks after surgery to a month after surgery, when there's no instrumentation, you get a recurrent disc injury. In fact, it's even mentioned in the medical that one of the possible complications of the surgery he had at L5S1. S1, I'm sorry. So you get a recurrent disc at L5S1, the exact same location as the work injury. As far as counsel is wrong about previous back problems, in the previous back problems that were all localized, and it's only on the accident, this accident, that you get a radiculopathy, a radiating pain down the leg, which is indication of a disc injury. Remember, he was a dock worker, and that's heavy work. So it wasn't unusual for him to have back sprains and things of that nature. But only when he hit the dock plate moving at five miles an hour backward and was jolted and thrown up and down on his vehicle do you end up with radicular pain. So there's no longstanding history of radicular pain. There's no history whatsoever of radicular pain until this accident. And it's not an accident that at an exact location where the initial hernia that they accepted is the exact location, L5S1, where you had the recurrent disc. Also, the radiologist did not read the L5S1 December X-ray as normal. He said there's a seven millimeter post-surgical scar encroaching on the nerve. That scar in itself could account, based on the literature and expertise of the commission that they do have, and the literature I pointed out to the commission, which was never moved to be stricken, but it was argued and provided the sites and literature to the commission, the medical literature, that is. And there's a case on point from the appellate court approving them, inferring the surgical scar as proof of causation. So Dr. Stanley reads the surgical scar plus a recurrent disc. Everybody reads the seven millimeter surgical scar. I don't know why nobody asked the radiologist because I thought it was irrelevant. Whether or not he thought there was one, he didn't say it was there. Now let's go to the last issue, which probably we need guidance from the court. Can I short circuit you a minute? Just to show you your definition of occupation isn't what the legislature intended. You forgot to read the second half of Section 10, where it says, Whereby reason of the shortness of the time during which the employee has been in the employment of his employer. That's not the occupation. That's working form. Or of the casual nature terms of the employment, it's impractical to compute the average weekly wage as above defined, where regard should be had to the average weekly amount which during the 52 weeks previous to the injury, illness, or disablement was being or would have been earned by a person in the same greater employment at the same work for each such 52 weeks. So the legislature did say in the employment of the employer, not in the occupation he was working at the time of his injury. Now this guy was in the employment of the employer even when he was a casual employee. The question becomes, is there sufficient information so that you can compute an average weekly wage based upon what he was paid, or do you go to the second half of 10 and say it can't be done because of the casual nature of his work? And so I'm back to the question is, how many hours did he work each week when he was a casual employee? Respondents Exhibit 4 will tell us that. And will tell us if he was working 40 hours a week as a casual employee or if he was only working 3 days a week or 19 hours a week. That's going to tell us everything. Okay. Is there any dispute as to those facts? No, there's no dispute as to what Respondents Exhibit 4 shows. You're accepting their calculation of his earnings during this period? That's what they paid him, $400. That's Exhibit 4. Okay. I do believe respectfully that the purpose of the Act is to provide replacement income in the employment, and I believe what I suggest the proper construction would be, they put the words at the time of the injury for a purpose. So you're saying employment slash position at the time of the injury. At the time of the injury becomes a modifier, and you can't just, why say at the time of the injury if it's during the entire employment period regardless what the position is? It's 52 weeks. All I can say is there must, if you read the statute, you have to give every part of it a purpose and rate it as a whole. And I do understand what you pointed out to me. Why I don't understand in which he was working, everybody ignores it. Right. But you didn't include it when you were talking about off on occupation. I mean, if every word is to be given meaning, you have to put some meaning to those words. Right. And that's what I agree entirely in which he was working, employment in which he was working at the time he was injured. But you're using employment slash position is what you're saying, the position he was in. Right. I'm reading basically the shortcut of my understanding is that there's no way an at-will employment is the same as a unionized employment. There are two different types of employment. It was an at-will employment, a casual employee, come, don't go, we don't promise you a job tomorrow. Once he's a unionized employment, I mean, really, you're telling me, the reason they join unions and they vote for unions and have unions is so they can have a contract. So the contractual employment, you're totally ignoring, if you don't consider this, you're totally saying that the union contract that came into existence when he entered the union is to be ignored as the basis of his employment. If that were logical, if that were logical, most people go to work in a union shop and they're not members of the union for a period of time when they first start working. Usually a month or two months. And if a person were injured 52 weeks after the first day he set foot on that employer's premises, but he wasn't a member of the union for two weeks, you'd contend that you only had to compute it based on 50 weeks because being a member of a union is different than not being a member of a union, vis-a-vis employment. That doesn't make any sense. Well, I can only deal with the facts of the case. No, but what I'm suggesting to you is, I mean, we're really torturing the word employment. If I employ somebody, that means they work for me. It doesn't make any difference whether they work for me as a member of a union or not as a member of a union, or they work for me not as a member of a union and then as a member of a union. I've still employed them. Well, I think it's a big difference when you employ somebody who has civil service rights or you employ somebody who has contractual union rights as opposed to an at-will employment. I think those are very different. It's a big difference as to his rights, but that's not a difference between the question of whether he was an employee. They're both employees, but there's different employments. One is employed as at-will employee. Another one is an employee with rights. I think these are legitimate issues that you'll give us direction on, and I'm sure we will. Thank you, counsel. You may reply. Counsel, I did have a question. Okay. Do you also agree that there is a dispute as to the facts relative to the hours that the client was working during that 52-week period? The wage statement is my exhibit, Your Honor. I'm relying on it. I have no dispute that it's incorrect in any way. Okay. Thank you. Thank you. Very good. Well, thank you, counsel, both, for your arguments in this matter. We've taken our advisement and written dispositions to issue. We'll stand and break for recess.